ELAM BOWMAN *v.* McKLEROY & BRADFORD et al.

A holder of a note given in payment of the price of property sold for the purpose of defrauding cre-
ditors, and secured by mortgage upon the property sold, cannot enforce his mortgage to the preju-
dice of creditors whose right of mortgage originated before the fraudulent sale and execution of the
note.

The recording of a judgment against a debtor, in a parish where he has negroes attached to a planta-
tion, of which he is part owner, creates a judicial mortgage upon the slaves, when the owner is not
domiciliated in the State.

Slaves under seizure cannot be hired out by the Sheriff, unless by the consent of parties, and the mort-
gagee is not entitled to receive hire for the slaves, during the time that they may be under seizure.

A deed of trust executed in Mississipi and recorded in this State, which expresses that it was given to
secure a certain amount, and also to secure future advances that might be made, cannot be enforced
here, against the property mortgaged, to the prejudice of other mortgage creditors, except for the
amount specified.

APPEAL from the District Court of the Parish of Tensas, *Farrar*, J.
*H. B. Shaw* and *A. N. Ogden*, for plaintiff. *Snyder & Reeves*, and *Clark
& Bayne*, for defendants and appellants. *T. P. Farrar*, for *Leggett*. *F. H. Far-
rar*, for *Cartwright & Doniphan*. *J. Aroni* and *J. W. Montgomery*, for *D. S.
Bisland* and *D. P. January*, intervenors. *U. B. & E. Phillips*, for *J. M. Motlow*
and *J. R. Bisland*. *George S. Sawyer* in *p. p.*

COLE, J. In December, 1855, *James R. Bisland*, one of the defendants, re-
sided on the Mississippi river, a few miles above Natchez, in the State of Mis-
sissippi.

He was then the owner of fifty-eight slaves, who figure in this suit, and which
appear to have then constituted the whole of his property.

These slaves were heavily mortgaged in the State of Mississippi to various
creditors.

On the night of the 17th of December, 1855, *Bisland*, without the knowledge
or consent of his creditors, placed all these slaves on a passing steamer, landed
them the next day more than a hundred miles below, on the Louisiana side, in
the parish of Point Coupée, at the plantation of his brother-in-law, *R. W. Mc-
Rae*, and immediately made a pretended sale of them to *James M. Motlow*, the
overseer of his brother-in-law, *McRae*.

The notes given by *Motlow* to *J. R. Bisland*, for the pretended price, were
transferred by said *Bisland* to *McRae*, and by him to *McKleroy & Bradford*.

These slaves were sold in 1856, by *Motlow* to *Elam Bowman*.

The first of the series of notes of *Motlow* to *J. R. Bisland*, having matured,
*McKleroy & Bradford* obtained from the District Judge in Point Coupée, an or-
der of seizure and sale against these negroes, who were then in the parish of
Tensas, in the possession of *Bowman*.

The sale was enjoined by *Bowman* in the District Court of Tensas.

The various creditors of *J. R. Bisland* intervened in that court, claiming to
enforce their liens, and making *J. R. Bisland* and *Motlow* parties.

The District Court decided the sale from *Bisland* to *Motlow* to be fraudulent,
null and void, as to the creditors, and gave judgment to each for the amount of
his claim against *J. R. Bisland*; ordered a sale of the slaves, and proceeded to
fix the rank in which the creditors should be paid, giving to *McKleroy & Brad-
ford* only such surplus as might remain after paying the creditors of *J. R. Bis-*

*land,* and placing *George S. Sawyer* last in the rank of the mortgage creditors aforesaid.

*McKleroy & Bradford* and *Sawyer,* have appealed.

We consider the plea to the jurisdiction to have been waived, and proceed to determine the rights of the different parties.

We are of opinion that the sale of *J. R. Bisland* to *Motlow,* of the slaves in litigation, was fraudulent and simulated ; that no consideration passed for the same from *Motlow ;* and that it was not really intended to be a sale so as to vest in *Motlow* a *bona fide* title to the negroes.

An important question now arises as to the respective rank of the mortgage creditors of *J. R. Bisland* and of *McKleroy & Bradford.*

The notes received by *J. R. Bisland* from *Motlow,* were transferred by *Bisland* to *McRae,* about the 2d of January, 1857, and by the latter to *McKleroy & Bradford,* about the 5th of January, 1857.

The creditors of *J. R. Bisland,* who are parties to this suit, hold mortgage claims against him upon these slaves, which originated prior to his sale to *Motlow.*

It is contended that *McKleroy & Bradford,* being the holders of the notes of *Motlow,* before maturity, are entitled to be paid the amount of the mortgage upon these negroes, securing them, in preference to the creditors of *Bisland,* who held mortgages originating before the execution of the notes by *Motlow.*

It appears that *McKleroy & Bradford* must have had notice before taking the notes of claims against these negroes. About April, 1856, *Motlow* published a notice in the New Orleans Picayune, where *McKleroy & Bradford* carried on their business, and in the Point Coupée Echo, stating that the consideration of the notes had failed, and warning all persons not to trade for them.

Suits were also pending, previous to their getting the notes, in the parish of Point Coupée, and there were in the mortgage office of Point Coupée mortgages recorded against these negroes, and it was in this parish where the sale of the slaves to *Motlow* was passed. If they intended to depend upon the mortgage, and not upon the makers and endorsers, to guaranty the payment of the notes, ordinary prudence would have made them examine the mortgage office of Point Coupée to see whether *Bisland,* before selling to *Motlow,* had not covered the slaves with liens. C. C. 2428.

But even if *McKleroy & Bradford* are holders of the notes for a valuable consideration before maturity, and without notice, they cannot avail themselves of the mortgage which is accessory to the notes, independently of the rights of creditors holding mortgages anterior to the execution of the mortgage securing their notes.

Their action upon the mortgage is one *in rem,* and is distinct in its nature from their personal action against the maker and endorsers.

The negotiability of notes has been created to facilitate commerce ; the protection of the holder before maturity and without notice against the equities existing between the maker and payee, or other parties, is an exception to the general rule, that a person cannot transfer a greater right than he possesses, and the negotiability of notes, and the rules appertaining thereto, must not be extended so as to effect more injury than good.

Mortgages are real rights, and are governed by certain rules as to rank from the time of their recording, and also from other causes.

The mere securing of a negotiable note by mortgage, cannot give to the mortgage a rank superior to one recorded before it.

If one mortgages property, not his own, and without any authority, to guaranty a negotiable note, the mortgage is without effect.

A party taking a negotiable note secured by mortgage, must incur the risk that there may be other parties who may successfully oppose his mortgage.

The mortgage is a privilege upon real property. Before the property can be held liable to secure a note, it must appear that the mortgagor was the owner of the property, or had the legal right to give the mortgage ; and if he had the right, still the mortgage may be defeated as to its effect, by the existence of tacit or conventional mortgages, superior to it in rank.

If the mortgagor were the pretended owner of the property by a simulated sale, the negotiability of the note cannot give force to the act of mortgage, and thus transform a simulated sale into a real one.

The negotiability of notes cannot destroy the rights of third persons to real property, who are not parties to the note, and perhaps know nothing of its existence.

It is true that the transfer of a note, carries with it its accessories, and the mortgage is an accessory, but the mortgage is conveyed only so far as the person giving it was entitled to create it.

If the latter held the property subject to tacit or conventional mortgages, then in granting to a third person a mortgage to secure a note, and in transferring the mortgage note to him, he transfers a right of mortgage inferior to mortgages held by other persons, and the holder of the mortgage note takes it thus, inferior to the rights of those persons.

If a different doctrine should obtain, the proprietors of real estate, and those holding *bona fide* mortgages would be entirely in the power of the unscrupulous. The negotiability of notes introduced to facilitate commerce, would be the destruction of property holders, and their rights would be sacrificed without ever being parties to the mortgage and note that doomed them to ruin.

It matters not in the present case, if the mortgages of the creditors of *J. R. Bisland*, originated in the State of Mississippi.

The rights of citizens of a sister State ought to be protected, as far as their protection does not conflict with our laws.

If we expect the claims of our citizens to be equitably determined in foreign tribunals, the right of foreign citizens must also be respected.

The eye of justice must look impartially upon the demands of parties ; its vision is not bounded by the limits of a State, but by those of the eternal principles of right and wrong.

It is antagonistical to those principles to permit a citizen of another State to run from that State his slaves, heavily mortgaged, into this State, in order to elude his mortgage creditors, and then to pass a simulated sale of the slaves to the overseer of his brother-in-law, and then to allow the brother-in-law to transfer the mortgage notes executed as the price, so as to make the mortgage securing the notes, to be superior to those of the creditors of the absconding citizen, which existed before his simulated sale to the overseer.

If this were sanctioned, instead of facilitating commerce, it would be highly detrimental to it.

For it would afford the shield of courts to the machinations of the unjust, and destroy all confidence in the security arising from mortgages on slaves, and this

BOWMAN
*v.*
MCKIEROY.

portion of the property of the State which constitutes so much of its wealth, would be almost useless as a security for debts.

A principle so unjust and destructive to the business of the south, ought not to be upheld by the judiciary.

We are, therefore, of opinion, that the creditors of *J. R. Bisland*, who held mortgages originating before the execution of the notes to *Motlow*, are entitled to be paid in preference to *McKleroy & Bradford*, the present holders of those notes.

We shall now proceed to fix the rank of the different parties to this suit, and the time from which their mortgages are to date, whether from being recorded in Mississippi or this State.

1. *D. S. Bisland* and *D. P. January*, paid a debt of *J. R. Bisland*, with whom they were bound on his appeal bond for the payment thereof. They had, therefore, an interest in discharging it, and their legal obligation was to pay it.

A legal subrogation consequently took place of right, according to Article 2157, number three of the Civil Code, and *D. S. Bisland* and *January* became subrogated to whatever right the judgment creditor had on the property of *James R. Bisland.* This right was a judicial mortgage which was recorded on the 22d of December, 1853, in the parish of Catahoula, where a part of the slaves then were attached to and working upon a cotton plantation, the undivided half of which then belonged to *J. R. Bisland*, who was domiciliated in the State of Mississippi.

We are of opinion that the recording of a judicial mortgage against a debtor in the parish where he has negroes attached to a plantation of which he is part owner, creates a judicial mortgage upon the slaves, when the owner is not domiciliated in the State of Louisiana ; for in such case, it is impossible to record it in the parish where the judgment debtor resides. *Mallard & Armistead* v. *Carpenter*, 6 An. 397 ; *Spencer* v. *Amis*, 12 An. 127.

The judicial mortgage of *D. S. Bisland* and *D. P. January*, must then take effect upon the slaves in controversy, which were in the parish of Catahoula at the time of the recording of the judgment. They will be designated in the decree.

The amount of their mortgage is $3,294 64, with eight per centum interest thereon, from the 4th January, 1852.

2. *Elam Bowman* bought the slaves in dispute of *Motlow*, but he also subsequently bought an outstanding mortgage upon these slaves.

This sale is null, because *Bowman* bought the slaves, subject to the decision of this suit as to the title of *Motlow*, and as *Motlow* is decreed to have no title, the sale to *Bowman* is without effect, and the right of mortgage of *Bowman*, which may be said to have been extinguished by confusion, revives.

This mortgage has effect from the 24th of February, 1854, for $11,584 40, with eight per cent. interest per annum from the 27th of December, 1855, until paid.

The negroes are in the possession of *Bowman ;* the mortgage creditors cannot, however, claim from him the hire.

This claim must be reserved to be urged by the owner or owners of the slaves.

When slaves are seized, the Sheriff cannot hire them out, unless by consent of parties.    C. P. Arts. 659, 662.

It is only when lands or houses are seized, that the Sheriff seizes "the rents, issues and revenues."    C. P. 656.

The mortgagee is not entitled to receive hire for slaves during the time they may be under seizure. C. C. Arts. 453, 457, 3371.

3. *Hackaliah Leggett's* mortgage is recognised for $13,500, with six per cent. interest on $4,500 thereof, from 7th February, 1855, on $5,000 thereof, from the 7th of March, 1855, and five per cent. interest on $4,000 thereof, from the 23d December, 1854.

The mortgage of *Leggett* is to date from the 17th of March, 1854.

His claim is based upon three drafts secured by mortgage from *J. R. Bisland*, passed in the State of Mississippi, on the 7th of March, 1854.

This mortgage is upon the slaves in controversy, and was recorded in Mississippi and Louisiana.

4. The mortgage of *Cartwright & Doniphan* is based upon a deed of trust executed by *J. R. Bisland* in their favor, on the 30th of May, 1854, on the slaves in controversy, and other property, which latter was afterwards exhausted by a sale under a prior mortgage in favor of *Miltenberger*.

The deed of trust expresses that it was made to secure five thousand dollars then due, to cover future advances to be made to *Bisland*, and to secure them for their liability on certain drafts of *Bisland*, on which they were accommodation endorsers.

The advances were made to about $14,000. The accounts of them, showing the exact amount due, were shown to *Bisland*, who admitted them, in writing, to be correct, and they were duly recorded in the mortgage records of Point Coupée, as containing the amounts intended to be secured in the deed of trust to which they refer.

We are of opinion, that the mortgage is void as to the creditors of *J. R. Bisland*, No.'s 1, 2, 3, 5 and 6, except for the $5000, which were specified. C. C. Art. 3277. *Frost* v. *Beekman*, 18th John. Ch. R. p. 550 ; An. Ch. Dig. by Wheeler, vol. 2, p. 191 ; 4 Kent, p. 175 ; 2 An. 974, 917 ; 9 R. 482.

This mortgage is to have effect from the 30th May, 1854, with interest at the rate of 6 per cent. from that date. The right of *Cartwright & Doniphan* is reserved to their personal action against *J. R. Bisland* for the excess of their claim over five thousand dollars.

5. *George S. Sawyer* is entitled to a mortgage upon certain of the slaves by virtue of a decree of the Vice Chancery Court, Southern District of Mississippi, at Natchez. His mortgage is $8445, with ten per cent. interest thereon from 1st July, 1854, and bears date from 1st July, 1854.

*J. R. Bisland* sold to *Sawyer* fifteen of the negroes seized in this suit in payment of this decree ; but the slaves were to remain in the possession of *Bisland*, being hired by him. *Bisland* afterwards carried them off in order to deprive *Sawyer* of his rights.

This illegal action of *Bisland* ought not to injure *Sawyer*.

The latter sold these fifteen negroes to *Bowman*. But as *Bowman* in his injunction in this case did not claim them, and as *Sawyer* did, without any objection on the part of *Bowman*, this may be considered as a tacit dissolution of the sale from *Sawyer* to *Bowman* at the time the intervention was filed.

After the intervention of *Sawyer* was filed, *Bowman* and *Sawyer*, by an act, mutually rescinded the sale.

Besides, even if the negroes belonged to *Bowman* at the time of the intervention of *Sawyer*, the latter had the right to intervene to defend the title he had conveyed to *Bowman*, for he had sold with special warranty.

So far as *Bisland* is concerned, *Sawyer* is entitled to consider the sale to himself of the fifteen negroes null, because *Bisland* ran away with them and caused the consideration to fail, and he has the right as to *Bisland* to have his mortgage enforced. If the sale were considered in force, then *Sawyer* would be entitled to a judgment for the fifteen negroes, but he has asked for judgment in the alternative either to have his title decreed to be valid for the negroes, or to have the mortgage enforced.

As the fifteen negroes are reasonably worth more than his debt, the other parties cannot complain at our recognition of his mortgage, instead of recognising him as owner of the fifteen negroes.

The rescission of the sale by *Bowman* in favor of *Sawyer* was not the purchase by *Sawyer* of a litigious right in the sense of Art. 2422 of the Civil Code, which forbids attorneys from purchasing litigious rights, falling under the jurisdiction of the tribunal in which they exercise their functions, because that Article does not refer to arrangements that lawyers may make as to their own claims, but to the purchase of rights in which they have no property.

6. The sale from *J. R. Bisland* to *Motlow* being rescinded so far as it affects the mortgage creditors of the former, who are parties to this suit, *McKleroy & Bradford* are entitled to be paid their claims as owners of the mortgage notes out of the balance of the proceeds of the sale of all the slaves in contestation, which shall be left after the satisfaction of the previous mentioned creditors in the manner specified as aforesaid.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be avoided and reversed; that the injunction sued out against the order of seizure and sale be perpetuated; that the sale of the slaves in contestation in this suit from *J. R. Blsland* to *J. M. Motlow*, is null, void and without effect as to the mortgage creditors of *J. R. Bisland*, whose claims are recognised in this judgment; that the sale of the said slaves from *Motlow* to *Elam Bowman* be rescinded; that the slaves aforesaid be seized and sold by the Sheriff of the Parish of Tensas, according to law, and that the various claimants be paid in the following rank out of the proceeds of all or a part of the slaves in contestation, as shall now be detailed.

I. *D. S. Bisland* and *D. P. January* shall be paid $3294 64, with 8 per cent. interest from the 4th January, 1852; their mortgage is recognised as taking effect from the 22d December, 1853. The said amount is to be paid out of the proceeds of the sale of all the slaves mentioned in their intervention and their issue, except the following, *Eliza Pierce*, *Yarrow*, *Sally*, *Victoria*, *Perry*, *Alsey Levi*, *Sucky* and *Peggy*.

II. *Elam Bowman* shall be paid $11,584 40, with 8 per cent. interest per annum from the 27th of December, 1855, until paid. His mortgage is to have effect from the 24th of February, 1854, and he is to be paid said amount out of the proceeds of the sale of all of the slaves.

The claim against him for the hire, use and enjoyment of the slaves in contestation is reserved, if any such right exists, to be urged in another suit in an action by the owner or owners of the slaves.

*Hackaliah Leggett* shall be paid $13,500, with 6 per cent. interest on $4500 thereof from the 7th February, 1855, and on $5000 thereof, from the 7th March, 1855, and 5 per cent. interest on $4000 thereof from the 23d of December, 1854. His mortgage is to take effect from the 17th March, 1854, and he is to be paid his claim out of the proceeds of the sale of all the slaves.

BOWMAN
*v.*
MCKLEROY.

IV. *Cartwright & Doniphan* shall be paid out of the proceeds of the sale of all the negroes in contestation, five thousand dollars, with 6 per cent. interest thereon from the 30th of May, 1854, from which date also their mortgage is to have effect for said amount. The balance of their claim shall be paid out of the residue, if any there be, of the proceeds of the sale of all the negroes in dispute, after paying all the preceding claims, and those that follow their claim in this judgment; or as much of their demand as can be so satisfied, reserving their rights against *J. R. Bisland* for any balance of their claim remaining unpaid.

V. *George S. Sawyer* shall be paid $8445, with ten per cent. interest thereon from the 1st July, 1854. His mortgage is to have effect from the 1st July, 1854, and he is to be paid said amount out of the proceeds of the sale of the negroes (and their issue) in contestation, which are mentioned in the decree of the Vice Chancery Court, Southern District of Mississippi, at Natchez, rendered and signed the 1st July, 1854, in the case of *George S. Sawyer* v. *James R. Bisland.*

VI. *McKleroy & Bradford* shall be paid the amount of their notes sued upon and their demand out of the proceeds of the sale of all the slaves in contestation, after the preceding five mortgage claims are paid the amounts of their mortgages recognised by this judgment. Their right of action against the makers and endorsers of the notes aforesaid, held by them, if any such they have, is reserved.

It is further ordered and decreed, that all costs of the lower court shall be paid out of the proceeds of the sale of the negroes, in preference to any of the preceding claims, and the costs of appeal shall be paid by *Cartwright & Doniphan.*

---

## SAME CASE—ON A RE-HEARING.

BUCHANAN, J. The re-hearing in this case was granted as to *Cartwright & Doniphan* and *McKleroy & Bradford.*

*Cartwright and Doniphan* were allowed by the judgment of the District Court, the sum of fourteen thousand three hundred and forty-three dollars and thirty-nine cents and interest, with right of mortgage for the whole of that sum. Our judgment reduced the mortgage of these intervenors to five thousand dollars, and reserved their personal action against *James R. Bisland* for the excess of their claim. In their petition for a re-hearing, *Cartwright & Doniphan* have not complained of this reduction of their mortgage, as compared with the other parties, to whom a right of mortgage has been allowed by the judgment, but contend that they ought to have a distributive share of the proceeds of the negroes seized, for the remainder of their claim, as ordinary creditors of *James R. Bisland*, there being more than enough to satisfy all the mortgage claims allowed by the judgment of the court.

Upon further consideration, we are satisfied that *Cartwright & Doniphan* are entitled to an amendment, in their favor, of our previous judgment. For the reasons stated by us heretofore, their right of mortgage cannot be allowed for more than five thousand dollars, but they are creditors of *James R. Bisland*, directly, by account acknowledged by him, for advances and supplies in the years 1854 and 1855, for the surplus of their claim, to the amount allowed by the District Court.

*McKleroy & Bradford* are holders of five promissory notes for $6960 each,

75

dated the 18th December, 1855, and payable respectively the 1st January, 1857, 1858, 1859, 1860 and 1861, made by *J. M. Motlow* to the order of, and endorsed by *James R. Bisland.*

The first of these notes alone was due and protested at the time *McKleroy & Bradford* instituted their hypothecary action, by executory process, on the 9th January, 1857. The whole of the five notes were filed in court, with their petition in that action, and at this time there are three out of the five notes due, amounting, in the aggregate, to twenty thousand eight hundred and eighty dollars. For this amount, with interest as expressed on the face of the notes, *James R. Bisland* is now the debtor of *McKleroy & Bradford.* But for the security of this debt, *McKleroy & Bradford* cannot pretend, upon the principles of our decision and of that of the District Court, to have any mortgage, as against the other creditors of their debtor, for both courts decree the act of mortgage of *Motlow* to *Bisland,* " his heirs and assigns," for the security of these notes, to be null and void, and of no effect, as to *Bisland's* creditors. *McKleroy & Bradford* are, therefore, viewed by us as ordinary creditors, at this time, of *James R. Bisland,* for his endorsements now due as above.

Now, this case being in its origin, a seizure under execution, the sale stayed by injunction, and third oppositions interposed by parties claiming liens and preferences; regularly, the court would have nothing to do but to settle the conflicting claims, and the rank of the liens upon the property seized; and would not feel authorised to distribute the proceeds of that property, in satisfaction of any mere ordinary debts of the owner of the property. But a contrary course has been adopted in the court below, and also in this court, with the consent and concurrence of all parties interested, debtor as well as creditors. All of those creditors had instituted suits to establish their claims, which suits are in evidence, and have been substantially, if not formally, consolidated with the present proceedings. In this manner, a sort of *concurso* has been formed, and the judgment appealed from as well as that of this court, resembles a tableau of distribution, in which ordinary creditors have a place, as well as privileged creditors. It is thus that *McKleroy & Bradford,* for instance, have been allowed any thing in our previous judgment.

In view of this position of the case, we have come to the conclusion to pass upon the ordinary claim of *Cartwright & Doniphan* at this time, without referring them, as before decreed, to their separate personal action against *James R. Bisland.*

The order and amount of the mortgages, as fixed by our previous judgment, will not be changed, but the residue of the proceeds of the slaves seized, after satisfying those mortgages, will be allotted *pro rata* to *Cartwright & Doniphan,* and *McKleroy & Bradford.*

It is, therefore, adjudged and decreed, that our judgment herein rendered on the 2d May, 1859, be amended; that *Cartwright & Doniphan,* as ordinary creditors, be paid out of the proceeds of the slaves seized, a sum of nine thousand three hundred and forty-three dollars and thirty-nine cents, with interest, at the rate of five per cent. per annum from the 1st January, 1856, until paid, in addition to the sum already allowed said *Cartwright & Doniphan,* as mortgagees in said judgment, under the number 4; the said sum of $9343 39, to take rank after the judgment in favor of *George S. Sawyer,* as mortgagee, under the number 5 in our previous decree, and to be paid concurrently and *pro rata,* (should there not be enough to satisfy both claims,) with the allowance herein after made to

*McKleroy & Bradford;* that *McKleroy & Bradford,* as ordinary creditors, be paid out of the proceeds of the slaves, after satisfying costs and mortgages, and concurrently with the ordinary claim of *Cartwright & Doniphan,* herein before allowed, a sum of twenty thousand eight hundred and eighty dollars, with interest at eight per cent. per annum, from the 18th December, 1855; that the costs of this appeal be borne, one-half by *Cartwright & Doniphan,* and one-half by *Mc-Kleroy & Bradford;* that the rights of *McKleroy & Bradford,* if any they may have, for the remainder of their claim by notes, not satisfied out of the proceeds of the slaves seized herein, be reserved to them, as against the maker and endorser of said notes; and that in all other respects, our judgment of the 2d May, 1859, · remain undisturbed.

LAND, J., absent.